**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  GURNAM SINGH, | : | **Chapter 7** |
| | : | |
| Debtor | : | **Bky. No. 08-17080 ELF** |
| | : | |
| GIANSANTE & COBB, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **Adv. No. 09-0037** |
| GURNAM SINGH, | : | |
| | : | |
| Defendant | : | |
| | : | |

# M E M O R A N D U M

## I. INTRODUCTION

On October 29, 2008, Gurnam Singh ("the Debtor"), a taxi cab driver and former owner of a liquor store in Burlington, New Jersey, filed a voluntary petition under chapter 7 of the Bankruptcy Code.  At the time of his filing, the Debtor owed a prepetition debt to, inter alia, Jagdish Tuli ("Tuli"), a friend who had extended business loans to the Debtor for use in operating the liquor store, and Giansante & Cobb, LLC ("the Plaintiff"), a law firm that had provided legal services to the Debtor in connection with real estate litigation that had been filed against him.

Prepetition, the Debtor repeatedly promised both creditors that he would make substantial, if not full, payment on his debts to them once he sold his liquor store.  The Debtor sold his store on December 28, 2007, but made no post-closing payments to either Tuli or the Plaintiff.  Postpetition, the Debtor claimed in his Statement of Financial Affairs that he realized

no profit from the sale of his liquor store.

In this adversary proceeding, the Plaintiff seeks the entry of an order denying the Debtor's

discharge pursuant to 11 U.S.C. §727(a)(2) and/or (a)(4). Alternatively, the Plaintiff seeks a

determination that the Debtor's debt to the Plaintiff is excepted from his discharge under 11

U.S.C. §523(a)(2)(A).[1]

With respect to the §727(a) claims, the Plaintiff contends that the Debtor received

proceeds from the sale of his store that he has concealed from his creditors and that the Debtor's

sworn statement that he realized no profit from the sale constitutes a false oath. The Plaintiff

also challenges the Debtor's (1) failure to disclose certain real property and business interests he

held in India on his bankruptcy schedules and Statement of Financial Affairs, (2) failure to

disclose accurately certain expenses on Schedule J of his bankruptcy schedules, and (3) incorrect

disclosure of an outdated address in the Statement of Financial Affairs ("SOFA").

In its §523(a)(2)(A) claim, the Plaintiff contends that the Debtor falsely represented that

---

[1]        At the close of trial, the Plaintiff agreed that its Proposed Findings of Fact and
Conclusions of Law would serve as the sole basis for setting forth the Bankruptcy Code provisions upon
which the Plaintiff relied to support its objection to discharge and request for a determination of
nondischargeability. (See N.T. at 141-143).

        In the introduction to its 19-page submission of Proposed Findings of Fact and
Conclusions of Law, the Plaintiff cited §523(a)(2)(B) in addition to §523(a)(2)(A). The Plaintiff never
proposed any findings of fact or legal conclusions to support a §523(a)(2)(B) claim, however. (See, e.g.,
Plaintiff's Proposed Findings/Conclusions, at 2). Additionally, while in the introduction to its Proposed
Findings of Fact and Conclusions of Law the Plaintiff referenced §523(a)(4) as a grounds for seeking a
determination of nondischargeability, (see Plaintiff's Proposed Findings/Conclusions, at 2-3), the
Plaintiff did not include fact findings or legal conclusions to support that ground for relief.

        I will therefore treat the §523(a)(2)(B) and §523(a)(4) claims as abandoned. See
Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 575 n.3 (M.D. Pa. 2004 ) (issues not briefed
may be deemed waived).

he would pay his outstanding debt to the Plaintiff as soon as he sold his liquor store when that was never the Debtor's intention.  The Plaintiff asserts that the Debtor made this misrepresentation to cause the Plaintiff to refrain from instituting any collection activity and to avoid paying the Plaintiff.  The Plaintiff claims to have been damaged in the entire amount of the Debtor's outstanding debt.

For the reasons elaborated below, I find that the Plaintiff has failed to meet its evidentiary burden on all of its asserted claims.  Accordingly, I will enter judgment for the Debtor and against the Plaintiff.

## II. <u>PROCEDURAL HISTORY</u>

On February 2, 2009, the Plaintiff commenced this proceeding by filing an Adversary Complaint.  (<u>See</u> Adv. Docket Entry No. 1).  The Debtor filed his Answer on February 9, 2009.  (<u>See</u> Adv. Docket Entry No. 4).  On October 26, 2009, the one (1) day trial of this matter was held and concluded.  Three (3) witnesses testified at the trial:  Louis Giansante (one of the Plaintiff's owners), Jagdish Tuli (one of the Debtor's creditors) and the Debtor.  Additionally, several documents were admitted into evidence.  (<u>See</u> Exs. P-1 through and including P-7, P-11 and D-1 and D-2).

At the close of trial, I took this matter under advisement and entered certain orders establishing a time frame for filing proposed findings of fact and conclusions of law.  (<u>See</u> Adv. Docket Entry Nos. 23, 26).  The last such filing was submitted on January 7, 2010.  (<u>See</u> Adv. Docket Entry No. 30).

3

### III.  SUMMARY OF THE EVIDENCE

#### A.  Background

1.    The Debtor filed his voluntary petition under chapter 7 of the Bankruptcy Code on October

29, 2008.  (See Bankr. Docket Entry No. 1).

2.    At the time the Debtor filed his bankruptcy petition, he earned his living working as a self-

employed taxi cab driver.  He continues to be employed as a taxi driver today.  He leases

the medallion for his taxi.  (N.T. at 134).

#### B.  The Debtor's Prepetition Debts To Jagdish Tuli and the Plaintiff

**Jagdish Tuli**

3.    Tuli is a creditor of the Debtor.

4.    Tuli first came to know the Debtor in 1995 through a friend, Gurdev Singh ("Gurdev"),

whom Tuli had met at temple.  (N.T. at 35, 48-49).

5.    At some point, Tuli learned that the Debtor and Gurdev were interested in buying a liquor

store. (N.T. at 35, 42-43).

6.    In approximately 2002, the Debtor purchased real estate, a liquor license, the existing

inventory and an associated business known as Bob's Liquor Store for $615,000.00.[2]  (N.T.

---

[2]        It is not entirely clear what form or forms of ownership the Debtor employed in purchasing the liquor store.  There is a reference in the record to a corporation owning the liquor license, (N.T. at 109), but it is unclear whether that corporation was the sole entity formed in connection with the purchase and subsequent operation of the business.  I note also that in connection with the Debtor's subsequent sale of the business in December 2007 (which is discussed below), both the lease/purchase agreement (Ex. P-12) and the HUD-1 closing statement (Ex. P-7) refer to the Debtor individually as "the Seller."   However, the Debtor's SOFA filed in his bankruptcy case refers to his ownership of a business "known as Bob's Liquor Store, **Inc.**" (Ex. P-11, SOFA at ¶18) (emphasis added).

4

at 106-107).  Bob's Liquor Store was located on High Street in Burlington, New Jersey.

(Ex. P-7).  Gurdev worked full time at the liquor store with the Debtor.  (N.T. at 108).[3]

7.      Beginning in March 2003 and ending in November 2005, Tuli made a series of loans to the

Debtor and Gurdev for the liquor store business.  (N.T. at 22-27, Ex. P-4).  In total, Tuli

lent $196,500.00.  (Ex. P-4).

8.      The Tuli-Debtor-Gurdev lending relationship was very informal.  Initially, Tuli relied solely

on their oral promises to repay and did not require the Debtor or Gurdev to sign promissory

notes. (N.T. at 53).  Tuli explained, "In India we trust friends more than anything."  (N.T. at

43).


**The Plaintiff**

9.      On or about January 26, 2005, the Debtor retained the Plaintiff law firm to defend him in

real estate litigation.  (N.T. at 6, 8; Ex. P-1).

10.     The Debtor and the Plaintiff signed a Retention Agreement relating to the Plaintiff's legal

representation of the Debtor.  (Ex. P-1).

11.     According to the terms of the Retention Agreement, the Debtor was required to pay the

Plaintiff's costs and fees no later than thirty (30) days from the date such costs and fees

were billed.  (Ex. P-1, at p. 2).

---

[3]      Ultimately, Gurdev, who is not an American citizen, became a silent, unofficial partner
in the business because Gurdev and Singh believed that under New Jersey law he was ineligible to be a
co-owner of the liquor license.  (N.T. at 81-82, 109).

12.   The Debtor paid the Plaintiff law firm a $3,500.00 retainer.[4]

13.   The Plaintiff first began providing legal services to the Debtor in the real estate litigation

matter in April 2006.  (N.T. at 14).

14.   Subsequently, the Plaintiff sent invoices to the Debtor for fees and costs associated with the

Plaintiff's legal representation:

     a.   as of October 9, 2006, the Plaintiff had issued four (4) invoices totaling $3,735.00;

     b.   between February 2007 and May 21, 2007, the Plaintiff issued an additional
        four (4) invoices totaling $4,847.50; and

     c.   finally, between June 25, 2007 and August 20, 2007, the Plaintiff issued three (3)
        invoices totaling of $2,543.50.  (N.T. at 9-10; Ex. P-2).

15.   By the end of the Plaintiff's legal representation of the Debtor, the Plaintiff had sent the

Debtor invoices bearing fees and costs totaling $11,126.00.

16.   After paying the retainer, see n.4, supra, the Debtor never made another payment to the

Plaintiff.  (N.T. at 11-12).

17.   After the Debtor's retainer was credited against the total balance of fees and costs the

Plaintiff billed to the Debtor, an unpaid balance of $7,626.00 remained.

18.   At some point, most likely in late September to early October of 2006, the Debtor told

attorney Louis Giansante ("Giansante")[5] that he was not in a financial position to pay the

_____

   [4]     Because the Debtor was financially unable to pay the agreed upon $3,500.00 retainer in
one lump sum, it was agreed that the Debtor could pay the Plaintiff's retainer in a series of three (3)
payments.  (N.T. at 7-8).  The Debtor paid $1,000.00 on February 1, 2005, $1,500.00 on February 15,
2005 and $1,000.00 on March 1, 2006.  (N.T. at 7-8; Ex. P-1, at p. 2).

   [5]     Giansante is a principal of the Plaintiff and one of the attorneys who represented the
Debtor in the real estate litigation matter and the Plaintiff's signatory on its Retention Agreement with
the Debtor.  (N.T. at 6-8).

6

Plaintiff's bills. (N.T. at 9-11).[6]  Giansante told the Debtor that the Plaintiff was willing to "carry a balance for a period of time" because Giansante was looking into potential insurance coverage for the litigation.  (N.T. at 9).

19.    At some unspecified point thereafter, apparently having ruled out the possibility of finding applicable insurance coverage, Giansante had further conversations with the Debtor regarding his outstanding, unpaid bill.  In those conversations:

    a.    the Debtor again told Giansante that he did not have the money to pay the Plaintiff's bills.  The Debtor told Giansante that he owned a liquor store, but did not have sufficient cash flow from the store's operations to pay the Plaintiff. (N.T. at 11).

    b.    the Debtor told Giansante that he was planning to sell the liquor store.  The Debtor promised Giansante that he would pay the Plaintiff's bills in full out of the proceeds of that sale.  (N.T. at 9-11, 73).

20.    After the Debtor promised to pay the Plaintiff law firm in full upon the sale of Bob's Liquor Store, Giansante continued to permit the Debtor to carry an unpaid balance.

21.    Additionally, the Plaintiff continued to represent the Debtor in the real estate litigation.  (N.T. at 8, 16-17; Ex P-1 at August 2007 invoice).

**The Tuli Promissory Notes of November and December 2006**

22.    On November 15, 2006, for the first time, Tuli required the Debtor and Gurdev to sign a promissory note with respect to their then-outstanding debt of $148,500.00 ("the November 2006 Note").  (N.T. at 51).  The November 2006 Note stated that the principal amount of $148,500.00 plus 9% interest was due to be paid in full by May 14, 2007 or upon the

---

[6]      The Plaintiff was not specific as to when the Debtor's first conversation with Giansante about his inability to pay occurred.  However, I infer that it most likely occurred around the time that the Debtor exhausted his retainer.  See Paragraph Nos. 12, 14, supra.

borrower's receipt of funds resulting from the successful completion of the sale of the liquor store.  (Ex. P-5, at 2).

23. At or around the time that the Debtor and Gurdev executed the November 2006 Note, they told Tuli that the liquor store was not doing well, that they intended to sell it and that the sale would enable them to pay him back.  (See N.T. at 32).

24. On December 12, 2006, the Debtor and Gurdev signed another Promissory Note promising to pay Tuli $148,500.00 plus 9% interest with respect to the business loans that Tuli had extended ("the December 2006 Note").  (N.T. at 28-31, 53-54; Ex. P-5).  The December 2006 Note does not evidence a separate debt to Tuli.  The December 2006 Note replaced the November 2006 Note, (N.T. at 54), and extended the due date for full payment to June 11, 2007 (or upon the borrower's receipt of funds from the sale of Bob's Liquor Store). (Ex. P-5, at p.1).

**Events Between May and early December 2007**

25. By May 2007, the Debtor had located a potential purchaser for Bob's Liquor Store, Amit Patel ("Patel").

26. The Debtor did not know or have a prior relationship with Patel prior to Patel's having expressed an interest in acquiring the store.  (N.T. at 74-75).

27. In May 2007, the Debtor and Patel executed a Lease/Purchase Agreement with respect to the liquor store.  (N.T. at 75-76, 100-103; 111-112).  The Lease/Purchase Agreement was not offered into evidence; however, the Debtor testified about its terms.  The Lease/Purchase Agreement:

8

    a.   required Patel to pay the Debtor the fair value of the liquor store's inventory plus $50,000.00, the latter of which was to be used to pay the store's outstanding bills.

    b.   required Patel to pay the Debtor $4,000.00 per month rent for the store until the date of the final settlement.  (N.T. at 102).

    c.   required Patel to pay telephone, insurance, property tax, utilities and property maintenance for Bob's Liquor Store.  (N.T. at 103).

    d.   did not state a purchase price. The only two (2) sums mentioned in the Agreement are the $50,000.00 payment for business debts and the $4,000.00 for monthly rent. (N.T. at 102).

28.    After the Debtor and Patel executed the Lease/Purchase Agreement in May 2007, Patel assumed complete control of the day-to-day operations at Bob's Liquor Store.  (N.T. at 113).[7]

29.    Meanwhile, in June 2007, the Plaintiff's legal representation of the Debtor ended with a settlement of the real estate litigation.  (N.T. at 8, 16-17; Ex. P-1 at August 2007 invoice). At that time, the Debtor asked Giansante to give him "a month or so to get [his] financial house in order" with respect to his outstanding, unpaid balance.  (See Ex. P-2, at p.1). Giansante apparently agreed.

30.    Giansante also wrote to the Debtor in June 2007 and offered to "write down" $2,658.50 of the firm's unpaid balance if the Debtor made immediate payment on his outstanding debt to the Plaintiff.  (N.T. at 16; Ex. P-2, at p.1).

---

[7]    At the time he entered into the Lease/Purchase Agreement, the Debtor had no money to pay bills and liquor was supplied to the store on a cash on delivery (COD) basis.  (N.T. at 75). The Debtor and Patel entered into a Lease/Purchase Agreement (rather than an agreement of sale with a specified closing date): (a) to keep the store operating through the use of the $50,000.00 Patel was required to pay "up front;" and (b) to permit Patel sufficient time to acquire a bank loan to fund the purchase and to arrange to have the Debtor's liquor license transferred to Patel's name.  (N.T. at 78).

9

**Events Surrounding the Completion of the Sale of Bob's Liquor Store – As to Tuli**

31. On December 4, 2007, under pressure from Tuli to repay his debt, the Debtor hand wrote a

letter to Patel, authorizing Patel to pay Tuli "whatever is left, balance from the settlement

which is approximately $105,000.00" on the settlement date.  (N.T. at 54-55; Ex. P-3).

32. Tuli testified that Patel was the one who suggested that the sum of $105,000.00 be used on

the handwritten note.  (N.T. at 21-22).  Tuli claims that Patel told him that Patel planned to

buy the liquor store for $635,000.00 less the $50,000.00 he had already paid the Debtor.

Tuli stated that Patel estimated that the Debtor's mortgage was approximately $400,000.00

and that the other closing expenses would likely amount to approximately $80,000.00.

This, Tuli testified that Patel told him, would leave $105,000.00 to pay to Tuli.[8]  (N.T. at

22-23).

33. The Debtor's sale of Bob's Liquor Store to Patel closed on December 28, 2007, six months

after the Debtor entered into the Lease/Purchase Agreement. (Ex. P-7).

34. On December 29, 2007, Patel advised Tuli that the closing already had occurred.  (N.T. at

32).[9]

35. Tuli received no payments from the Debtor after the closing on the sale of Bob's Liquor

Store.

---

[8]     At trial, there was no objection to this hearsay testimony.

[9]     Tuli testified that the Debtor had promised Tuli that he could attend the settlement, but
then did not advise him of the closing date.  (N.T. at 32).  I do not credit Tuli's testimony that the Debtor
had promised Tuli that he could attend the settlement.

10

36.    The HUD-1 for the sale of Bob's Liquor Store:[10]

     a.    lists a contract sales price of $485,000.00, (Ex. P-7, line 101);

     b.    states that Patel paid an additional $100,000.00 for personal property, (Ex. P-7, line 102);

     c.    attributes an additional $10,586.24 to payment for inventory, (Ex. P-7, line 104);

     d.    states that Patel paid the Debtor $70,000.00 of the contract sales price in advance of the closing date, (Ex P-7, line 508); and

     e.    states that the Debtor was required to pay money – i.e., $3,526.99 -- at the settlement, (Ex. P-7,  line 603).[11]

37.    With respect to the $70,000.000 that the Debtor received from Patel in advance of the

closing date, the Debtor:

     a.    used $50,000.00 to pay the liquor store's outstanding bills as required by the Lease/Purchase Agreement he signed with Patel, (N.T. at 113-114);

     b.    used $6,000.00 on May 22, 2007 to pay Tuli, (N.T. at 41-42, 115);

     c.    used $10,000.00 to pay money owed to the prior owner of the liquor store, (N.T. at 115-116); and

     d.    attributed $3,000.00 to a cash payment Patel made to the Gurdev with the expectation that Gurdev would use the money to pay an additional $3,000.00 to

---

[10]      As stated earlier in the text, the purchase agreement for Patel's acquisition of Bob's Liquor Store, if there was one, was not introduced into evidence at trial.  (The Debtor testified that the Lease/Purchase Agreement was the only contract he had that related to the sale of Bob's Liquor Store to Patel.  (N.T. at 101-102)).  Other than the earlier-described Lease/Purchase Agreement, the only documentary evidence offered regarding the terms of Patel's acquisition of the Debtor's liquor store was a HUD-1.  Additionally, Patel did not testify at trial.

[11]      The Debtor borrowed from Patel the money he needed to pay at the settlement.  As part of the settlement, the Debtor put certain funds in escrow to pay estimated tax liabilities.  When the escrowed funds turned out to be more than the actual taxes, the Debtor used the $3,307.35 that was refunded to him to pay back part of the settlement money that he borrowed from Patel.  (N.T. at 118-120, 132).

11

Tuli.  (N.T. at 117);[12]

     e.   did not account for the remaining $1,000.00.

38.   According to the Debtor's unrebutted testimony, the price Patel paid for Bob's Liquor Store

constituted a fair price for the business.  (N.T. at 85).

39.   On or about January 10, 2009, the Debtor met with Tuli to discuss the closing.  (N.T. at 58-

60).  The Debtor showed Tuli a document in the nature of a reconciliation as to how the

proceeds of the sale were attributed.  (N.T. at 34-35, 60).

40.   Tuli testified that he asked the Debtor why Patel did not pay him (Tuli) $105,000.00 as

promised.  Tuli contends that the Debtor responded by stating that he and Patel placed a

lower amount than the true sale price (i.e., lower than $635,000.00) on the HUD-1 because

the Debtor "did not want to pay all the taxes."  (N.T. at 35).  Tuli interpreted the Debtor's

statement to mean that the Debtor received money from Patel "under the table," i.e., that

the Debtor received additional monies that were not reflected on the HUD-1.  (See N.T. at

46, 61).[13]


**Events Surrounding the Completion of the Sale of Bob's Liquor Store – As to the Plaintiff**

41.   The Debtor never told Giansante that he sold his liquor store.  (N.T. at 12).

42.   The Debtor did not use any of the advance deposit money he received from Patel to pay the

Plaintiff.  Instead, the Debtor used the deposit money solely to pay the liquor store's debts

---

[12]      Tuli testified that he never received more than $6,000.00 from the Debtor and Gurdev.
He contests receiving the second payment of $3,000.00.  (N.T. at 31-32, 34-35).

[13]      As explained below in Part IV.A.3., I do not credit Tuli's testimony on this critical fact.

and liabilities.  (See N.T. at 113-117).

43. In March 2008, seven (7) months after the Plaintiff issued its final invoice, the Debtor told

Giansante that he was continuing to have difficulty paying his outstanding balance.  The

Debtor inquired whether the Plaintiff would be willing to reduce the amount of his

outstanding bill if he made immediate payment.  (N.T. at 12).

44. In response, Giansante wrote to the Debtor on March 10, 2008.  In the letter, Giansante:

    a.   again offered to write down $2,658.50 of the Debtor's outstanding indebtedness
           if the Debtor paid immediately;

    b.   stated that he was willing to accept payment on the Debtor's outstanding
           balance in three (3) equal payments of $1,653.84, to be paid on the first day of
           each succeeding month.  (Ex. P-2, at p.1);

    c.   stated that if the Plaintiff did not receive the Debtor's first payment within the
           next 10 business days, its offer to reduce the Debtor's outstanding bill and to
           accept payment over a three (3) month period would be withdrawn, (Ex. P-2, at
           p.1);

    d.   stated that the Plaintiff needed to begin receiving payments from the Debtor
           immediately or it would "have no alternative but to assume that [the Debtor's]
           obligations [would] not be satisfied voluntarily," (Ex. P-2, at p.1); and

    e.   advised the Debtor that unless the Plaintiff received payment within twenty-one
           (21) days from the date of the March 10 letter, the Plaintiff might take "all
           appropriate action" to collect the balance due on the Debtor's account, including
           filing a complaint in the Superior Court of New Jersey.  (Ex. P-2, at p.2).

45. After the filing of the Debtor's bankruptcy petition,[14] at the meeting of creditors in the

Debtor's main bankruptcy case, Giansante learned for the first time that the Debtor had sold

the liquor store.  (N.T. at 13).

---

[14]     In the bankruptcy schedules, which were filed along with the bankruptcy petition on
October 29, 2008, the Debtor listed the Plaintiff as an unsecured creditor with a $7,625.00 claim related
to "Legal fees - 6/2006."  (See Ex. P-11 at p. 17).

### C. Issues Concerning the Debtor's Bankruptcy Schedules and Statement of Financial Affairs

46. On the same day that the Debtor filed his chapter 7 bankruptcy petition, i.e., October 29, 2008, he filed Schedules A through J and his SOFA.   (See Ex. P-11 at pp. 25-29).

47. Both the Debtor's bankruptcy schedules and his SOFA were accompanied by declarations that he filed under penalty of perjury stating that he read the schedules and/or statements contained in the SOFA and any related attachments and they were true and correct to the best of his knowledge, information and belief.  (See Ex. P-11 at pp. 24, 29).


### Schedule A - Failure to Disclose the District Una Property

48. At the time he filed his bankruptcy petition and schedules, the Debtor had an ownership interest in residential real property in District Una in India ("the District Una Property"). (N.T. at 124-126, 69)

49. The District Una Property:

   a.  is comprised of three (3) bedrooms and two (2) bathrooms, (N.T. at 126);

   b.  was formerly owned by the Debtor's father, (N.T. at 70, 98-99); and

   c.  was inherited by the Debtor and his three (3) brothers after their parents died; as a result, the Debtor has a one-fourth (1/4th) ownership interest in the property.  (N.T. at 98-99, 124-126).

50. The Debtor's brother and sister and their children and the Debtor's two (2) daughters, aged 7 and 11, were living in the District Una Property at the time the Debtor filed his bankruptcy schedules.  These family members continued to live in the District Una Property at the time of trial.  (N.T. at 69-70, 100).

51.    At trial, the Debtor estimated that the District Una Property is worth approximately

$17,000.00. (N.T. at 126).  No other valuation evidence was offered by either party.

52.    The Debtor did not disclose his ownership interest in the District Una Property in his

bankruptcy schedules.  On Schedule A, regarding real property ownership, the Debtor

falsely stated, "None."  (See Ex. P-11 at Schedule A).

53.    At trial, the Debtor expressed confusion regarding whether he was required to disclose

property ownership in India on his bankruptcy schedules.  (See N.T. at 125).


**SOFA - Failure to Disclose Prior Ownership and Sale of the Ahiba Power Grip Company**

54.    In 2004, the Debtor and a business partner owned the Ahiba Power Grip Company

("Ahiba"), a factory in Thaliwal, District Una, India.  (N.T. at 127-131; Ex. P-6).

55.    Ahiba was sold in 2006 and the Debtor personally received approximately $7,000.00 to

$8,000.00 as his share of the proceeds from the sale.[15]  (N.T. at 131).

56.    The Debtor did not disclose his prior ownership of Ahiba in Paragraph 18 of his SOFA.

Nor he disclose the proceeds he realized from the sale of Ahiba.  (See Ex. P-11 at p.27).[16]

---

[15]    It is not clear exactly what the parties meant when they used the term "factory" during
the trial.  For some, especially persons raised in the United States, the term often connotes a
manufacturing operation on a large scale, in a large building (e.g., like a General Motors plant).  From
the vague description offered at trial and the modest sale price the Debtor received, it might be that the
Debtor's "factory" was little more than a small building with a few pieces of equipment, something more
akin to a "mom and pop" sized operation.

[16]    During the trial, there was passing reference to another potential business interest that
the Debtor might have owned in India.  Specifically, Tuli testified that, at some point, the Debtor told
him "that there is another factory, they make [ropes].  And it's not doing well and he [the Debtor] wants
to sell the factory.  I [i.e., Tuli] don't know what happened to those factories."  (N.T. at 37).  The
Debtor's potential ownership of this other factory was never developed at trial, having never come up

(continued...)

**SOFA and Prepetition Conduct - The Debtor's Use of an Outdated Mailing Address**

57.  At the time of trial, the Debtor and his wife lived at 6727 Short Lane in Upper Darby,

Pennsylvania ("the Short Lane Property").  (N.T. at 67, 88).

58.  When he filed his bankruptcy petition in October 2008, the Debtor was living on Glenwood

Avenue in Clifton Heights, New Jersey.  (N.T. at 68).

59.  Prior to residing at the Glenwood Avenue address, the Debtor lived at 29 Stuart Avenue in

Lansdowne, Pennsylvania.  (N.T. at 68-69).

60.  Before moving to the Stuart Avenue address, from October 2002 to April 2004, the Debtor

lived at 16 Oakley Road in Upper Darby, Pennsylvania ("the Oakley Road Property").

(N.T. at 93-94).

61.  The Debtor sold the Oakley Road Property in April 2004 to a friend.  (N.T. at 93).  Despite

not having lived at the Oakley Road Property since he sold it in April 2004, as a matter of

convenience, the Debtor continued to use the Oakley Road Property address as his mailing

address until approximately 2008.  (N.T. at 93-95).  Until approximately 2008, the Debtor

had all of his mail sent to the Oakley Road Property address.  (N.T. at 123).  The Debtor

made arrangements with the friend to whom he sold the property to hold his mail until he

could pick it up.  (N.T. at 124).

62.  The Debtor testified that he continued to use the Oakley Road Property address after he

moved because he thought he would be moving again and changing his mailing address

---

[16](...continued)

again in anyone's testimony.  Accordingly, the record provides insufficient basis upon which to make any
findings regarding whether and when the Debtor owned another factory, the nature of such ownership,
the disposition or prior status of such ownership and the consequences of the absence of a disclosure
regarding the business in the Debtor's SOFA.

frequently would be confusing.  (N.T. at 124).

63.    In response to paragraph 15 on his SOFA, which requires the Debtor to disclose his prior

addresses for the past three (3) years, the Debtor falsely stated that prior to January 1, 2008,

he resided at the Oakley Road Property.  (See Ex. P-11 at p. 26).

64.    Evidence was offered at trial to suggest that at least two (2) of the Debtor's unsecured

creditors were inconvenienced by the Debtor's prepetition use of the no longer valid Oakley

Road Property mailing address:

    a.    Discover Card[17] sued the Debtor prepetition and tried to serve him at the Oakley
        Road Property address and, as late as March 2008, had the summons returned
        reflecting that the Debtor could not be found.  (N.T. at 94-95).  The Debtor never
        advised Discover Card of his current address.  (N.T. at 97).

    b.    Tuli attempted to locate the Debtor after the closing on Patel's acquisition of Bob's
        Liquor Store and went to the Oakley Road Property to find him.  Tuli testified that
        the current occupants told him that the Debtor did not live there, they simply
        collected his mail and the Debtor would visit them to retrieve the mail.  (N.T. at 56).
        Tuli testified that he was able to find the Debtor's then-current address on Stuart
        Avenue by searching on the internet.  (N.T. at 57).[18]

## SOFA - Dispute Regarding Proceeds From the Sale of Bob's Liquor Store

65.    On his SOFA, the Debtor stated that:

From 2002 until 12/28/2007 debtor owned a business and real estate known as Bob's
Liquor Store, Inc. and located on High Street in Burlington NJ.  The business and real
estate were sold 12/28/2007.  Debtor did not realize any profit from the sale and sold

---

[17]    In his bankruptcy schedules, the Debtor disclosed Discover Card as a creditor holding an
unsecured claim for $9,245.00 with respect to "Credit card charges - 11/2006."  (Ex. P-11 at p. 17).

[18]    In January 2005, the Plaintiff used the Oakley Road Property address on its Retention
Agreement with the Debtor.  (See Ex. P-1).  However, the Plaintiff did not establish that it was harmed or
inconvenienced in any way by addressing the Retention Agreement in this manner.  None of the
Plaintiff's invoices were sent to the Oakley Road Property address.  (See Ex. P-2).

the business because it was loosing [sic] money.

(See Ex. P-11 at p. 27).

66. The Debtor testified that the HUD-1 fully and accurately represented the financial terms of

the sale of Bob's Liquor Store to Patel,  (N.T. at 73-74), and that neither he nor Gurdev

received any money "under the table" in relation to the sale, (N.T. at 74, 104).


**Schedule J - Contested Miscellaneous Expenses**

67. On Line 15 of Schedule J, which requires that the Debtor disclose "[p]ayments for support

of additional dependents not living at your home," the Debtor listed "school tuition and

support for debtor's children residing with debtor's family in India" and an estimated

monthly amount of $800.00.  (Ex. P-11 at p.22).

68. At trial, the Debtor testified that, to support his two (2) children, he gave them "whatever

they need[ed]."  (N.T. at 136-137).  He stated that their support included school tuition, bus

fare, clothing and the doctor and amounted to approximately $500.00 to $600.00 a month.

(N.T. at 137-39).

69. On Line 13.b. of Schedule J ("Installment payments . . . Other payment(s)"), the Debtor

listed "Wife's credit cards" and an estimated monthly amount of $600.00.  (Ex. P-11, p.

22).

70. On Line 4 of Schedule J, the Debtor allocated $400.00 a month to food expenses and

$100.00 a month to clothing.  (Ex. P-11 at p.22).

71. At trial, the Debtor testified that the $600.00 amount he had attributed to payment on his

wife's credit cards was correct, that his wife had a couple credit cards, that she used them to

18

buy "food . . . something [for] . . . herself [and] women stuff," and that she did not have

any cards with very old balances.  (N.T. at 139-40).

### D.  The Debtor's Wife's Post-Petition Acquisition and Ownership of the Current Family Residence

72.  The Short Lane Property is owned solely by the Debtor's wife.  (N.T. at 88-89).  She

purchased the property on February 27, 2009 (i.e., postpetition) for approximately

$70,000.00.  (N.T. at 90-92, 121).

73.  The Debtor's wife does not work; she is disabled.  (N.T. at 88).  She receives "Social

Security" income.  (N.T. at 88).[19]

74.  The Debtor's wife had no money in the bank at the time the Debtor filed his bankruptcy

petition.  (N.T. at 88).  Additionally, she had not inherited any money in the time frame

immediately preceding the bankruptcy filing.  (N.T. at 88).

75.  When asked where his wife obtained the $70,000.00 to purchase the Short Lane Property,

the Debtor provided two conflicting accounts:

    a.  When asked this question the first time, the Debtor responded that his wife obtained
        the money from her children and friends.  (N.T. at 89).

    b.  When asked the same question a second time, however, the Debtor said that his
        wife borrowed $63,000.00 from the Bank of America to purchase the Short Lane
        Property, granting Bank of America a mortgage on the property, (N.T. at 121-122),
        and funded the balance of the $70,000.00 purchase price with money the Debtor
        saved from driving a taxi cab.  (N.T. at 123).  He stated that the monthly mortgage
        payment was $600.00.  (N.T. at 140).

76.  The Debtor further testified that:

---

[19]      In Schedule I of his Bankruptcy Schedules, the Debtor stated that his wife received
$2,131.00 a month in Social Security income.  (See Ex. P-11 at p.21).  At the time of trial, the Debtor
testified that his wife receives $1,500.00 to $1,700.00 a month in Social Security income.  (N.T. at 122).

      a.   he is not a co-owner of the property;

      b.   he is not a co-obligor with respect to the alleged Bank of America note; and

      c.   his name does not appear on the alleged Bank of America mortgage.

(N.T. at 88-89, 121-122).

77.   At trial, the Debtor was shown a document purporting to be a "public access folio" from the county in which the Short Lane Property is located that suggested that no mortgage has ever been recorded against the property. The Debtor had no explanation as to why this might be so. (N.T. at 140).

78.   At trial, the Plaintiff offered the wife's postpetition acquisition of the Short Lane Property as circumstantial evidence in support of its argument that the Debtor must have received more money from the sale of his liquor store than is reflected on the HUD-1 and lied about that income on his SOFA.

## IV. DISCUSSION

The Plaintiff asserts claims aimed at both: (1) denying the Debtor his discharge pursuant to 11 U.S.C. §§727(a)(4)(A) and 727(a)(2)(A) and (2) obtaining a determination that the Debtor's debt to the Plaintiff is nondischargeable under 11 U.S.C. §523(a).

I begin my discussion with the Plaintiff's §727 claims.

### A. §727(a)(4)(A)

Pursuant to §727(a)(4)(A), a debtor may be denied a discharge if "the debtor knowingly

and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C.

§727(a)(4)(A).  Section 727(a)(4)(A) is designed to ensure that the debtor provides honest and

reliable information to the trustee and others interested in the administration of the bankruptcy

estate without their having to conduct costly investigations to discover the debtor's true financial

condition.  See, e.g., In re Retz, 2010 WL 2220063, at *4 (9th Cir. June 4, 2010); In re Burnley,

1999 WL 717215, at *3 (Bankr. E.D. Pa. Aug. 27, 1999).

   To successfully challenge a debtor's discharge under §727(a)(4)(A), the Plaintiff must

demonstrate by a preponderance of the evidence that:

   1.  the debtor made a false statement under oath;

   2.  the debtor knew the statement was false;

   3.  the debtor made the statement with the intent to deceive; and

   4.  the statement was material to the bankruptcy case.

Cadle Co. v. Zofko, 380 B.R. 375, 382 (W.D. Pa. 2007); In re Spitko, 357 B.R. 272, 312 (Bankr.

E.D. Pa. 2006); In re Chusid, 1998 WL 42292, at *7 (E.D. Pa. Jan. 21, 1998).  For the purposes

of §727(a)(4)(A), "[a] debtor's failure to list all assets owned in his Bankruptcy Schedule and

Statement of Financial Affairs can constitute a false oath . . . since these statements are made

under oath."  Cadle Co., 380 B.R. at 382; accord Spitko, 375 B.R. at 312.

   An honest mistake or oversight is not sufficient to deny a debtor his or her discharge.

Spitko, 357 B.R. at 312.  Rather, to satisfy the requirement that a false statement was made

knowingly, the Plaintiff must prove that the Debtor knew the truth "and nonetheless willfully and

intentionally [swore] to what is false."  Cadle Co., 380 B.R. at 382; see also In re Spitko, 357

B.R. at 312 (reckless indifference to the truth will satisfy §727(a)(4)(A) if the subject matter is

material to administration of the bankruptcy case).

Fraudulent intent may be proven by circumstantial evidence or inferred from a pattern of

nondisclosure and concealment.  Cadle Co., 380 B.R. at 383.

Finally, the "materiality" element of §727(a)(4)(A) requires proof that the subject matter

of the debtor's false statement or omission "bears a relationship to the bankrupt's business

transactions or estate, or concerns the discovery of assets, business dealings, or the existence and

disposition of his property."  Cadle Co., 380 B.R. at 383 (citation omitted).

The Third Circuit has cautioned that denying a debtor his discharge "is an extreme step

and should not be taken lightly."  Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993).

Objections to discharge are liberally construed in favor of the debtor and strictly construed

against the creditor.  Id.  Additionally, "'[t]he reasons for denying a discharge to a bankruptcy

must be real and substantial, not merely technical and conjectural.'"  Palmacci v. Umpierrez, 121

F.3d 781, 786 (1st Cir. 1997) (citation omitted).

The Plaintiff relies on the following alleged false oaths to support its §727(a)(4)(A)

claim:

> (1) the Debtor's disclosure of $800.00 for support of his children in India (when
> his trial estimate was $500.00 to $600.00) and the $600.00 he listed on Schedule
> J relating to payment of his wife's credit cards (arguing that the Debtor
> double-counted the $400.00 allotted for his household's food expense and the
> $100.00 clothing expense by including it within the monthly payment amount
> attributed to his wife's credit card and by separately listing the expense again
> under Food and Clothing);
>
> (2) the Debtor's statement on his SOFA that he lived at the Oakley Road Property
> until January 2008 when he has not lived at that address since 2004;
>
> (3) the Debtor's statement on his SOFA that he received no profit from the sale of his
> liquor store (i.e., the Plaintiff contends the Debtor received money in excess of

22

that reflected on the HUD-1 and, on his SOFA, the Debtor concealed what he
received);

(4) the Debtor's statement on Schedule A that he owned no real property when he
held a 1/4th ownership interest in the District Una Real Property in India; and

(5) the Debtor's incomplete disclosure on his SOFA with respect to his past and
present business holdings (i.e., that the Debtor failed to disclose his prior
ownership of and sale of a business, i.e., Ahiba, in India).

I will consider each of these grounds in turn.

## 1.  The Schedule J Estimates

The Plaintiff contends that the Debtor's Schedule J estimates regarding the support he
provides to his children in India and the monthly amount his household pays on his wife's credit
card constitute false oaths that justify denying the Debtor his discharge pursuant to
§727(a)(4)(A).  I find that the Plaintiff failed to sustain its evidentiary burden.  The Plaintiff
failed to prove that the Debtor made a false statement (and that he knew he made a false
statement and did so with fraudulent intent).

Schedule J requires the Debtor to estimate monthly expenses.  There was no showing
at trial that the $800.00 that the Debtor disclosed on Schedule J did not constitute a good faith
estimate.  I acknowledge that the Debtor's estimate for this same expense at the time of trial was
closer to $600.00.  However, the fact that with four (4) months' worth of postpetition experience
the Debtor adjusted his estimation of the support he ends up providing to his children does not
prove that his original estimate was false, that the Debtor knew it was false or that his original
estimate was made with fraudulent intent.

Similarly, the Plaintiff failed to prove that the Debtor made a false statement, did so

23

knowingly and/or did so with fraudulent intent regarding the disclosure of a $600.00 expense for

the payment of his wife's credit cards.  The Plaintiff relies largely on the Debtor's inclusion of

the word "food" (and "women stuff," from which the Plaintiff seems to have inferred that

clothing was included) in his vague recitation of what he believes his wife uses her credit cards

for.  (See N.T. at 139-40).  The Plaintiff suggests that the $600.00 expense the Debtor attributed

to credit card payments duplicated other expenses (i.e., the $400.00 expense for food and

$100.00 for clothing) already listed on Schedule J.[20]  The Plaintiff's evidence, consisting as it did

solely of Debtor's testimony that his wife had a couple credit cards that she used to buy "food. . .

.  something for herself [and] women stuff," (N.T. at 139-140), is, at best, vague, and sorely

insufficient for the purposes of establishing that the $600.00 credit card payments duplicated

other Schedule J expenses, that the Debtor knew this and that the Debtor nonetheless added the

expense to Schedule J with fraudulent intent.


### 2.  Use of the Oakley Road Address Prepetition and On the Debtor's SOFA

The Plaintiff's second ground for objecting to the Debtor's discharge is based on the

Debtor's prepetition, continued use of the Oakley Road Property address after he had moved

elsewhere.  The Plaintiff contends in its Proposed Findings/Conclusions that:

> Debtor's continued use of an address at which he no longer resided is of
> particular concern, Debtor has been defrauding his creditors for several years.
> All of his bills, including those of his creditors listed on his petition were sent to a
> fictitious address since 2004.  It is questionable as to whether any of his creditors
> would have issued credit or continued to issue credit to the Debtor if Debtor
> had listed his real address.

---

[20]    (See Plaintiff's Proposed Findings/Conclusions, at 19: "Obviously, the credit card is
being used for monthly expenditures already listed on the petition individually.").

(Plaintiff's Proposed Findings/Conclusions at 18 n.1).

Even assuming, arguendo, that the Plaintiff proved at trial what it included in this paragraph of its Proposed Findings (a doubtful proposition),[21] the Plaintiff's claim would still fail because the Plaintiff failed to establish the required elements of a §727(a)(4)(A) claim.  Section 727(a)(4)(A) claims have their genesis in a false oath made in or in connection with the case.  Plaintiff  has focused its attention on the Debtor's prepetition use of the Oakley Road address and extrapolated various, potential ill effects the use of the address may have had on the Debtor's prepetition creditors.  However, the Debtor's prepetition conduct is not the issue.  Under §727(a)(4)(A), the focus is on any false oath the Debtor may have made in or in connection with his bankruptcy case.

Here, the relevant oath is the Debtor's statement in his SOFA that "[p]rior to 1/1/2008 debtor resided at 16 Oakley Road, Upper Darby, PA."  (Ex. P-11 at p. 26).  Technically, the Debtor's SOFA statement is false.  The evidence at trial established that the Debtor had not resided at the Oakley Road Property since 2004.  The Debtor's SOFA statement is also incomplete.  While the Debtor disclosed his Glenwood Avenue address on his petition, (Ex. P-11 at p.1), nowhere in his bankruptcy filings did he disclose his Stuart Avenue address.

Nevertheless, a relevant concern under §727(a)(4)(A) is the degree to which, if any, that misstatement impeded the proper administration of the bankruptcy case.  The Plaintiff did not

---

[21]    The Debtor's testimony was that he continued to use the Oakley Road address because he had made arrangements to pick up his mail there and did not anticipate staying long at the Stuart Avenue address (and essentially thought that changing his mailing address twice in a short period would cause confusion).  The Plaintiff did not produce evidence that rebutted that testimony or that caused me to doubt the Debtor's explanation.

adduce evidence or articulate any convincing argument that the misstatement regarding the

Debtor's prior addresses materially obstructed (or even reasonably could have obstructed) the

efforts of the case trustee and creditors to investigate the Debtor's financial affairs.  Further, the

Plaintiff failed to prove that the Debtor made this false disclosure on his SOFA willfully and with

fraudulent intent.  The Plaintiff did not suggest any reason why the Debtor should wish to

conceal his Stuart Avenue address.


### 3.  The Debtor's SOFA Disclosure Regarding the Sale of the Liquor Store

The Plaintiff's third ground for objecting to the Debtor's discharge pursuant to

§727(a)(4)(A) is its contention that the Debtor made a false statement on his SOFA when he

stated that he did not realize any profit from the sale of his liquor store to Patel.  The Plaintiff

contends that the Debtor received money "under the table" from Patel, money that is not reported

on either the HUD-1 or the Debtor's SOFA.[22]

The Plaintiff bases this claim, in large part, on its belief that the HUD-1 suggests that the

Debtor sold the liquor store for $665,586.24.   However, this belief is based on an erroneous

reading of the HUD-1.  The Plaintiff erred by double-counting the disclosed advance deposits of

$70,000.00 disclosed on the HUD-1 as if the $70,000.00 was paid a second time at closing.  (See

---

[22]        Based on its reading of the HUD-1 (which, as explained just below in the body of the
Memorandum, is a misreading of the HUD-1), the Plaintiff also complains that the Debtor has failed to
"account for" certain sums it contends the Debtor received in connection with the sale.  (See Plaintiff's
Proposed Findings/Conclusions, pp. 6-7).  To the extent that the Plaintiff's complaint is that the Debtor
failed to explain satisfactorily any purported loss of assets (e.g., sales proceeds or deposits), such an
allegation would have been more appropriately raised under §727(a)(5), a claim that the Plaintiff did not
assert.  The Plaintiff failed to explain how such allegation that the Debtor has not explained he
disposed of assets he allegedly had prior to the bankruptcy fits within the construct of a §727(a)(4)(A)
claim.

Plaintiff's Proposed Findings/Conclusions at p.6).[23]

Aside from its flawed reading of the HUD-1, the Plaintiff's proof with respect to this claim consists of the following:

(1) As late as December 4, 2007, Patel told Tuli that he was going to be buying the liquor store for approximately $635,000.00. Yet, twenty-four (24) days later, if the HUD-1 is believed, Patel bought the store for only $595,586.24 (a difference of $39,413.76);

(2) Tuli's testimony that on January 10, 2008, the Debtor told him that he did not "write" $635,000.00 on the HUD-1 because he did not want to "pay all the taxes;"

(3) In February 2009, the Debtor's wife acquired the family's home on Short Lane for $70,000.00 and the Debtor has given conflicting and not entirely satisfactory accounts regarding how she came up with the money, how she could qualify for a bank loan when she had only a modest level of Social Security income and why the Plaintiff's search did not reveal the existence of a mortgage on the Short Lane Property; and

(4) While the "official" documentation regarding the sale, i.e., the HUD-1, shows no net proceeds, the Debtor has conducted at least some of his business dealings in an informal, undocumented fashion (e.g., borrowing money from Tuli for two (2) years without any formal promissory notes documenting the transactions and repayment obligations).

While this evidence is of some concern, on balance, it was insufficiently developed to meet the Plaintiff's evidentiary burden. For several reasons, I am not persuaded, by a preponderance of the evidence, that the Debtor received a concealed, net profit from the sale of his liquor store, contrary to his disclosure statement in his SOFA.

First, the mere fact that Patel ultimately paid less for the liquor store on December 28,

---

[23]     According to the HUD-1, the Debtor sold the liquor store for $595,536.24 ($485,000 (Ex. P-7, line 101) plus $100,000 (Ex. P-7. line 102) plus $10,586.24 (Ex. P-7, line 104)). Of that sum, $70,000.00 (Ex P-7, line 508) was paid in advance and credited against what the buyer had to pay at settlement. The Plaintiff obtains the $665,586.24 sale price, by adding the $70,000.00 itemized on the HUD-1 as if were paid at closing in addition to the sale price.

2007 than the amount he may have estimated previously[24] does not lead inevitably to the

conclusion that Patel colluded with the Debtor to defraud the Debtor's creditors.  There are too

many possible explanations why the parties may have reduced the sale price for me to find that

money passed under the table.  For example, Patel may have been unable to obtain the financing

necessary to support a gross sales price of $635,000.00.  Or, Patel may have taken a hard look at

the sales performance, assets and liabilities of the liquor store and revised his earlier estimate of

the liquor store's fair market value as the settlement date neared.  To the extent, Patel may have

reduced his purchase offer in the weeks or days before the closing, the Debtor did not have a

strong bargaining position and probably was not in a position to resist the reduction.  Even Tuli

acknowledged that the liquor store was losing money such that the Debtor and Gurdev were not

able to draw salaries.  (See, e.g., N.T. at 45).  Patel was not called as a witness as trial.

Accordingly, I do not know what reasons he might have proffered for the difference in projected

and actual sales prices.

Second, the evidence established that Patel and the Debtor had no pre-existing

relationship or any association outside of the buyer-seller relationship. This suggests that the

transaction was made at arms-length.  Thus, I have difficulty understanding what Patel's

motivation would be for agreeing to assist the Debtor in hiding profit from his creditors.

Third, I find it difficult to accept Tuli's testimony that the Debtor told him that he

received an unreported profit from Patel.  Assuming arguendo that the Debtor did receive money

"under the table," why would the Debtor admit that to Tuli, particularly at a time Tuli was

---

[24]     Tuli's weak hearsay testimony is the sole source of evidence for the suggestion that Patel
previously stated that he would pay more for the liquor store.  See n.8, supra.

pressing him for payment?  Moreover, had the Debtor (for whatever reason) shared with Tuli the
incriminating facts that he and Patel had concealed the true consideration for the sale of the
business and that he (the Debtor) had received money "under the table," I would have expected
the Debtor to have shared some of the hidden consideration with Tuli  – in which case, Tuli
would never have come forward in this case to testify.

Finally, while the Plaintiff's questions regarding source of the Debtor's wife's funds for
the purchase the Short Lane Property raise some valid concerns, they are no more than that  –
questions which, by themselves, do not establish falsity with respect to the Debtor's statement
that he received no net profit from the sale of the liquor store.  Simply put, the Plaintiff left too
many avenues unexplored.  For example, there is no evidence of inquiry being made of Bank of
America, the purported mortgagee.  Additionally, the Debtor's wife was not called to testify
about precisely how she funded the purchase.  Certainly, the source of the funds for the down
payment on the Short Lane Property was ascertainable.  I am not prepared to deny the Debtor's
discharge based on conjecture or innuendo.

In the end, I find that the Plaintiff's evidence in support of this theory insufficient to meet
its evidentiary burden.

### 4. The Debtor's Failure to Disclose His Ownership Interest in the District Una Property and Ownership and Sale of Ahiba

The Plaintiff's final §727(a)(4)(A) claim relates to the Debtor's failure to disclose his
ownership interest in the District Una Property in India and his failure to disclose his ownership
interest in Ahiba (as well as the proceeds he obtained from the sale of Ahiba).

29

The Debtor's failure to disclose these ownership interests and/or sale on his SOFA constitutes a false statement (or omission) made under oath. Because these ownership interests bear a relationship to the Debtor's assets and business dealings and concern the existence and disposition of his property, the Plaintiff also satisfied the "materiality" prong of §727(a)(4)(A). The more difficult question is whether the Plaintiff produced sufficient evidence to establish that the Debtor omitted these interests from his SOFA with fraudulent intent (or with reckless disregard as to the truth). See, e.g. Cadle Co., 380 B.R. at 382; see also Spitko, 357 B.R. at 312. Having carefully considered the issue, I conclude that the Plaintiff did not.

Because debtors will rarely to admit to fraudulent intent, the requisite intent necessary for the denial of discharge under §727(a)(4)(A) may be inferred from circumstantial evidence, such as a pattern of nondisclosure and concealment. Cadle Co., 380 B.R. at 383. Having observed the Debtor over the course of the trial of the adversary proceeding and considered the circumstances in which the false disclosures were made, I find that the Debtor's omission of these ownership interests is more likely attributable to confusion, ignorance or mistake, rather than fraudulent intent.

While I recognize that the Debtor previously owned a liquor store and Ahiba (some sort of factory in India) and that the ownership of these business concerns might suggest that the Debtor possesses at least some degree of sophistication, the Debtor did not appear to me to be particularly sophisticated. Oftentimes, he had difficulty understanding and answering questions that were posed to him. This might be attributable, in part, to language difficulties.[25] I consider

---

[25]    His testimony also was difficult to understand at times, which has resulted in a less than ideal trial transcript.

it likely that those language difficulties impeded effective communication between the Debtor

and his counsel – in particular, with respect to the Debtor's obligation to disclose all assets

located abroad and the particulars of prior transactions that took place abroad.  Additionally,

while the Debtor was not asked about his educational background, Tuli testified that he

sometimes typed documents for the Debtor because the Debtor was not well-educated and could

not read and write well.  (N.T. at 39).  I believe this combination of factors, rather than any

fraudulent intent to deceive, more than likely caused the inadvertent omission of the District Una

Property and Ahiba from the Debtor's schedules and SOFA.

While I do not minimize the importance of the requirement that each debtor provide

full, reliable and accurate information on his or her bankruptcy filings and do not condone

knowing, willful omissions of assets, in the totality of the circumstances presented here, I am not

persuaded by a preponderance of the evidence that the Debtor omitted his ownership interests in

Ahiba and the District Una Property with fraudulent intent.  Accordingly, I find that the Plaintiff

failed to meet its evidentiary burden with respect to this (as well as its other) §727(a)(4)(A)

claim(s) or ground(s) for seeking a denial of the Debtor's discharge.


### B.  §727(a)(2)(A)

The Plaintiff's second ground for seeking a denial of the Debtor's discharge is 11 U.S.C.

§727(a)(2)(A).

Section 727(a)(2)(A) provides that the court shall grant the debtor a discharge unless "the

debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate . . . has . . .

concealed . . .  property of the debtor, within one year before the date of the filing of the

31

petition." 11 U.S.C. §727(a)(2)(A).  The purpose of §727(a)(2)(A) is "to deny a discharge to a

debtor who attempts to prevent the collection of his debts by concealing or disposing of assets."

In re Ingle, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987).

> To successfully sustain an objection pursuant to §727(a)(2), the Plaintiff must show:
>
> 1.  that the act complained of was done at a time subsequent to one year before the filing of the petition or after the date of the filing of the petition;
>
> 2.  with intent to hinder, delay, or defraud a creditor of the property under the Bankruptcy Code;
>
> 3.  that the act was that of the debtor or his duly authorized agent; and
>
> 4.  that the act consisted of transferring, removing, destroying or concealing any of the debtor's property.

E.g., In re Chusid, 1998 WL 42292, at *8-9.

In support of its §727(a)(2)(A) claim, the Plaintiff repeats a subset of the allegations

it relied upon to support certain of its §727(a)(4)(A) claims.  Specifically, the Plaintiff contends

that the Debtor concealed his ownership interest in the District Una Property, (see Plaintiff's

Proposed Findings/Conclusions at p.15), and the alleged "under the table" profit he received

from the sale of his liquor store.

Plaintiff's §727(a)(2)(A) claims fail for the same reasons its §727(a)(4)(A) claims failed.

I find that the Debtor did not act with the intent to hinder, delay, or defraud a creditor when he

omitted his ownership interest in the District Una Property from Schedule A.  Additionally, as set

forth above, I find that the Plaintiff failed to prove by a preponderance of the evidence that the

Debtor received a profit from the sale of his liquor store.

Accordingly, I conclude that the Plaintiff failed to sustain its burden with respect to its

§727(a)(2)(A) claims.

## C.  §523(a)(2)(A)

In addition to seeking to deny the Debtor his discharge, the Plaintiff also seeks to except the Debtor's debt to the Plaintiff from the scope of his discharge.  The Plaintiff's primary ground for seeking a determination of nondischargeability is 11 U.S.C. §523(a)(2)(A).

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ."  11 U.S.C. §523(a)(2)(A).

To prevail on a complaint brought under §523(a)(2)(A), a creditor bears the burden of proving the following elements by a preponderance of the evidence:

1. the debtor made a material misrepresentation of fact that he or she knew at the time was false or contrary to his or her true intentions;

2. the debtor made the representation with the intention and purpose of deceiving the creditor;

3. the creditor justifiably relied on the representation; and

4. the creditor suffered a loss or damages as a proximate cause of the false representation or act.

See, e.g., In re Giquinto, 388 B.R. 152, 165 (Bankr. E.D. Pa. 2008); In re Antonious, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006); In re Glunk, 343 B.R. 754, 759 (Bankr. E.D. Pa. 2006); see also Grogan v. Garner, 498 U.S. 279, 291 (1991) (regarding preponderance standard); In re Cohn, 54 F.3d 1108, 1114 (3d Cir. 1995).

33

Intent is a required element of §523(a)(2)(A).  For purposes of §523(a)(2)(A), "[t]o be actionable, the debtor's conduct must involve moral turpitude or intentional wrong:  mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient."  In re Schwartz & Meyers, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991).  Determining whether a debtor had the requisite fraudulent intent is a subjective inquiry.  Field v. Mans, 516 U.S. 59, 70-72 (1995).   In this Circuit, intent and knowledge may be inferred based on the "totality of the circumstances."  See In re Cohn, 54 F.3d at 1118-19.

In connection with its §523(a)(2)(A) claim, the Plaintiff contends that the Debtor made a material misrepresentation to the Plaintiff, i.e., the Debtor represented falsely that he would pay his outstanding debt to the Plaintiff as soon as he sold his liquor store.  The Plaintiff argues that, at the time the Debtor made this representation, the Debtor had no intention of paying the Plaintiff's bill.[26]   The Plaintiff argues that, when the Debtor made this representation, the Debtor already knew that the proceeds he was supposed to receive from the sale of his business would be insufficient to pay anything to Plaintiff.  Additionally, the Plaintiff contends that, even after the Debtor had already sold his liquor store business, he continued to ask the Plaintiff to forbear from instituting collection actions or litigation, falsely representing that he would pay his bill as soon

---

[26]    Although the Plaintiff never expresses its theory in precisely this way, I acknowledge that the Plaintiff's theory also might encompass the notion that the Debtor's promise to pay upon the sale of his business included an implied representation that the value of the liquor store was such that he would have sufficient net proceeds from the sale to possess the ability make payment.  The difficulty for the Plaintiff under such a theory is that the implied representation would be one regarding the financial condition of the Debtor or an insider (insider being defined to include a corporation of which the debtor is a person in control (11 U.S.C. §101(31)).  See, e.g., In re Sacco, 270 B.R. 382, 385-386 (Bankr. W.D. Pa. 2001) (representations regarding a debtor's ability to repay a debt concern debtor's financial condition).  Under §523(a)(2), those types of representations must be in writing to be actionable.  In re Lucas, 386 B.R. 332, 336 n.5 (Bankr. D.N.M. 2008).  There is no evidence here that the Debtor provided any written representations regarding the financial condition of Bob's Liquor Store.

34

as he sold his liquor store.  The Plaintiff asserts that the Debtor made the foregoing material

misrepresentation(s) to cause the Plaintiff to refrain from instituting any collection activities and

to avoid paying the Plaintiff.  The Plaintiff alleges that it justifiably relied on the Debtor's

misrepresentation.  Finally, the Plaintiff contends that, as a result of the Debtor's

misrepresentation, it was harmed in the amount of the Debtor's entire debt, i.e., $7,625.00, plus

interest, attorneys' fees and costs.

Having carefully considered the evidence and the parties' legal submissions, I conclude

that the Plaintiff failed to prove the elements necessary to sustain its §523(a)(2)(A) claim.

With respect to the first required element – that the Debtor made a material

misrepresentation of fact that he knew was false or contrary to his true intentions – the Plaintiff

contends that, at the time the Debtor told Giansante that he would pay his legal bills as soon as he

sold his liquor store, the Debtor actually had no intention of ever paying the Plaintiff.  Plaintiff

argues that, by making this false representation, the Debtor obtained a forbearance from the

Plaintiff – i.e., that the Plaintiff waited for payment rather than commencing collection activity or

litigation.[27]  The Debtor also presumably obtained further legal services from the Plaintiff.  (The

---

[27]        Lurking as a potential threshold issue with respect to whether the Plaintiff established
the required elements of a §523(a)(2)(A) claim is whether a forbearance constitutes an "extension of
credit" for the purposes of §523(a)(2).  This is an issue that has divided the courts.

A majority of courts have held that a fraudulently induced forbearance may
constitute an "extension" of credit for the purposes of §523(a)(2).  See, e.g., Ojeda v. Goldberg, 599 F.3d
712, 719 (7th Cir. 2010) ("We think it is abundantly clear that a fraudulently induced forbearance fits
squarely within [the definitions of "extension" or "renewal"], and note that other circuits have reached
the same conclusion"); Field v. Mans, 157 F.3d 35 (1st Cir. 1998) ("by deceiving the [Plaintiffs] into
continuing a credit arrangement they . . . had the right to terminate, the [Debtor's] fraud related to what
can properly be called "an extension of credit"); In re Gerlach, 897 F.2d 1048, 1050 (10th Cir. 1990)
("[a]n extension, within the meaning of  §523(a)(2), is 'an indulgence by a creditor giving his debtor
further time to pay an existing debt"); In re Plechaty, 213 B.R. 119, 125-126 (B.A.P. 6th Cir. 1991)

(continued...)

Debtor made this representation in 2006 and the Plaintiff continued to provide legal services to

the Debtor until the real estate litigation matter concluded in June 2007).

It is well established that "a broken promise to repay a debt, without more, will not

sustain a cause of action under §523(a)(2)(A)." In re Harrison, 301 B.R. 849, 854 (Bankr. N.D.

Ohio, 2003). Were it otherwise, every breach of contract would give rise to a nondischargeability

claim under §523(a)(2)(A). "Instead, central to the concept of fraud is the existence of scienter

---

[27](...continued)
(creditor's delay in demanding payment was an extension under §523(a)(2); In re Chapman, 1991 WL
247602, at *3-4 (N.D. Ill. Nov. 18, 1991) (forbearance is "akin to an extension of credit pursuant to
§523(a)(2)); In re Beetler, 368 B.R. 720, 730 (Bankr. C.D. Ill. 2007) (fraudulently induced forbearance
may constitute an extension of credit for purposes of §523(a)(2)(A)); In re Baxter, 294 B.R. 800, 807
(Bankr. M.D. Ga. 2003) (in concealing true financial situation to induce Plaintiff not to act on its
contractual  rights to call a bond, debtor received an extension of credit); see also In re Kucera, 373 B.R.
878, 885 (Bankr. C.D. Ill. 2007) (finding that "[f]raudulently induced forbearance may constitute an
extension of credit for the purposes of §523(a)(2)(A) but the Plaintiff had failed to prove that fraud or
false representation caused the Plaintiff to forbear); In re Nathan, 1993 WL 300054, at *4 (Bankr. S.D.
Fla. June 23, 1993) ("an extension of credit under §523(a)(2) is 'an indulgence by a creditor giving his
debtor further time to pay an existing debt'") (citation omitted).  These courts have premised their
conclusions on the definition of "extension" provided by Black's Law Dictionary, which defines an
"extension" as "[t]he continuation of the same contract for a specified period of time," or "[a] period of
additional time to take action, make a decision, accept an offer, or complete a task." Black's Law
Dictionary 622 (8th ed. 2004).

A minority of courts have rejected the proposition that a forbearance may satisfy
§523(a)(2)'s requirement of an "extension" or "renewal" of credit. See, e.g., In re Booher, 284 B.R. 191,
202-203 (Bankr. W.D. Pa. 2002) ("mere forbearance from the exercise of any acceleration right, without
more" does not constitute an "extension of credit"; §523(a)(2) only contemplates extensions of credit that
legally result in a debt, thus for an extension of credit to be contemplated by §523(a)(2), the extension
itself must provide a creditor with a right to payment); In re Kressner, 206 B.R. 303, 311 (Bankr.
S.D.N.Y. 1997) (forbearing collection activity does not constitute an extension of credit), subsequently
aff'd, 152 F.3d 919 (2d Cir. 1998) (Table); In re Bacher, 47 B.R. 825, 829 (Bankr. E.D. Pa. 1985)
("[f]orbearing collection efforts does not constitute an extension of credit within the meaning of
§523(a)(2)(A)")

I need not resolve this issue because I find that, even if I were to assume, arguendo, that
forbearance constituted an "extension of credit", the Plaintiff's §523(a)(2)(A) claim still would fail on
other grounds. Also, for any representations made before June 2007, the Plaintiff's §523(a)(2)(A) claim
may be based, not on forbearance, but on the Plaintiff's delivery of actual, additional legal services to the
Debtor after the Debtor renewed his promise to pay the firm's bill in full upon the sale of Bob's Liquor
Store.

which, for the purposes of §523(a)(2)(A), requires that it be shown that at the time the debt was

incurred, there existed no intent on the part of the debtor to repay the obligation." Id.  As set

forth above, determining whether a debtor had the requisite fraudulent intent involves a

subjective inquiry.  Field, 516 U.S. at 70-72.

Applying a subjective standard of intent and considering the totality of the circumstances

in ascertaining the Debtor's intent in this case, I find that the Plaintiff failed to meet its burden of

establishing that, at the time the Debtor promised to pay the Plaintiff from the proceeds of the

sale of his liquor store, he had no intent to pay.

The Plaintiff urges me to find, as circumstantial evidence of the Debtor's intent not to

pay, that, when the Debtor made his promise to Giansante, he could not have intended to keep it

because he already knew that the proceeds that he would receive from the sale of his business

would be insufficient to pay anything to the Plaintiff.  The evidentiary record is insufficient to

support such a finding.  The Plaintiff failed to introduce evidence to establish that, at any

given point in time in advance of the settlement date, the Debtor knew what the proceeds of sale

were going to be and/or knew that those proceeds would pale in comparison to his debts and

liabilities.

The Plaintiff did establish that the Debtor signed promissory notes to Tuli in November

and December 2006 for $148,500.00 that made the Debtor's debt to Tuli payable upon the

closing date on the sale of the liquor store.  There is also evidence that in December 2007, the

Debtor authorized Patel to pay Tuli the net proceeds from the sale, which on December 4th was

estimated to be $105,000.00.  Other than these two facts, the evidentiary record is devoid of pre-

closing information that would provide me with a picture of what the liquor store's debts and

liabilities were and what the Debtor knew about the nature and extent of those debts and

liabilities when he made the representation(s) to Giansante.  Further, the Plaintiff failed to

introduce evidence to establish when the Debtor first knew what the final terms of the sale to

Patel would be.[28]

The Plaintiff also urges to me to find that the Debtor continued to promise that he would

pay his legal bills from the proceeds of the sale of his liquor store even <u>after</u> the store had been

sold  – in other words, at a time when the Debtor would have known how the proceeds of the sale

had been applied.  The Plaintiff contends it refrained from exercising its legal remedies with

respect to the Debtor's debt in reliance on such a fraudulent misrepresentation.  There is <u>no</u>

evidence to support such a finding.

With respect to the post December 2007 period, the evidence was simply that the Debtor

told Giansante that he was having difficulty coming up with the funds to pay the Plaintiff and

wondered if the Plaintiff would be willing to write down some portion of his debt if he were able

to pay immediately.  (N.T. at 12).  There is no evidence that the Debtor made any further

---

[28]      In its Proposed Findings of Fact, the Plaintiff urges to me to find that, "prior to
receiving [the Plaintiff's] last bill, debtor had agreed to sell the business for $585,000.00 which was less
than the outstanding debts of the business which included but were not limited to the mortgage of at least
$481,000.00, Mr. Tuli's promissory note to be paid upon the sale of the business of $148,000.00."
Plaintiff's Proposed Findings/Conclusions at 12.  The Plaintiff does not provide any supporting citations
to the record and I can find no evidentiary support for such a f inding.  The Debtor did ultimately receive
$485,000.00 as a contract sales price plus $100,000.00 for personal property and $10,586.24 for
inventory.  (<u>See</u> Ex. P-7).  However, the closing on the sale occurred in December 2007 and the Debtor
received his last bill from the Plaintiff in August 2007.

The Plaintiff also proposed the finding that "[t]he sale of the business was consummated
by August 2007.  Debtor knew what he was supposedly receiving for the business and he knew it would
be insufficient to pay [the Plaintiff]."  (<u>Id.</u>).  Again, Plaintiff does not support its assertion regarding the
alleged August 2007 "consummation" of the sale with cites to the evidentiary record and I find no
support in the record for it.

representations about the sale of his business.

Consequently, as a result of the Plaintiff's failure to establish by a preponderance of the evidence that the Debtor promised to pay the Plaintiff from the proceeds of the sale of his liquor store during a time when he had no intent to pay, the Plaintiff's §523(a)(2)(A) claim must fail.

## V.  CONCLUSION

Accordingly, for the reasons set forth above, I will enter judgment in favor of the Defendant-Debtor and against the Plaintiff on all of the Plaintiff's claims.

DATE:  June 25, 2010      _____
                          **ERIC L. FRANK**
                          **U.S. BANKRUPTCY JUDGE**